## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| ─────────────────────────── | ) | |
| **In re:** | ) | |
| | ) | |
|     **JEFFREY J. PROSSER,** | ) | **Bankruptcy No. 2006-30009** |
| | ) | **Chapter 7** |
|     **Debtor.** | ) | |
| ─────────────────────────── | ) | |
| | ) | |
| **STAN SPRINGEL, CHAPTER 11 TRUSTEE** | ) | |
| **OF THE BANKRUPTCY ESTATE OF** | ) | |
| **INNOVATIVE COMMUNICATION** | ) | |
| **CORPORATION AND JAMES P.** | ) | |
| **CARROLL, CHAPTER 7 TRUSTEE OF** | ) | |
| **THE BANKRUPTCY ESTATE OF** | ) | |
| **JEFFREY J. PROSSER,** | ) | |
| | ) | **Civil Action No. 3:2013-0087** |
|     **Plaintiffs/Appellees,** | ) | **consolidated with** |
| | ) | **Civil Action No. 3:2013-0010** |
|     **v.** | ) | **Civil Action No. 3:2013-0056** |
| | ) | **Civil Action No. 3:2013-0057** |
| **JEFFREY J. PROSSER,** | ) | |
| | ) | |
|     **Defendant/Appellant.** | ) | |
| ─────────────────────────── | ) | |

**Attorneys:**
**Norman A. Abood, Esq.,**
Toledo, OH
**Robert F. Craig, Esq.,**
Omaha, NE
**Lawrence H. Schoenbach, Esq.,**
New York, NY
    *For Appellant*

**Yann Geron, Esq.,**
New York, NY
**Samuel H. Israel, Esq.,**
**William H. Stassen, Esq.,**
Philadelphia, PA
**Bernard C. Pattie, Esq.,**
St. Croix, U.S.V.I.
    *For Appellees*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on the "Chapter 7 Trustee's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction," filed on November 7, 2017 by James P. Carroll ("Carroll" or the "Trustee"), the Chapter 7 Trustee of the bankruptcy estate of the Debtor and Appellant, Jeffrey J. Prosser ("Prosser"). (Dkt. No. 70). In his Motion, Carroll asserts that Prosser and his wife, Appellant Dawn Prosser, sold two 375kw generators that were located on certain property—the Anna's Hope Property—on St. Croix (the "Property"). The Prossers had pledged the Property as a supersedeas bond to stay the sale of the Property (that had been ordered by the Bankruptcy Court) during the pendency of the consolidated appeals that are currently before this Court. Carroll seeks, *inter alia*, to enjoin the Prossers from further selling any portion of the Property, including any fixtures thereon, and to require them to deposit the proceeds from the sale of the generators into an escrow account pending resolution of the appeals.

As directed by the Court in an Order entered on November 10, 2017 (Dkt. No. 71), the Prossers filed a Response on November 12, 2017. (Dkt. No. 73). The Trustee filed a Reply on November 14, 2017 (Dkt. No. 74), and the Prossers requested (Dkt. No. 75) and were granted permission (Dkt. No. 76) to file a Sur-Response, which they filed on November 15, 2017. (Dkt. No. 77).

For the reasons that follow, the Court will grant the Trustee's Motion for a Temporary Restraining Order ("TRO").

## I.     BACKGROUND

This matter stems from a consolidated appeal of five Bankruptcy Court Orders that were entered in 2012 and 2013. The Bankruptcy Court found that the Prossers had engaged in contempt

of court by failing to obey an Order requiring them to protect a wine collection, valued between $2.15 and $2.28 million. The Bankruptcy Court imposed sanctions of $528,086.07, representing the amount of the Trustee's attorney's fees and expenses in litigating the matter, and $419,135.59 reflecting the diminution in value of the missing and unmarketable wines to the Bankruptcy Estate. When the Prossers failed to pay the sanctions, the Bankruptcy Court sought to coerce their compliance by issuing additional Orders. Specifically, if the Prossers failed to cure their default, one of the Orders required them to execute deeds of title conveying ownership of Plots 168, 169, 170 and 171 of Estate Shoys on St. Croix—the "Anna's Hope Property"—to the Chapter 7 Estate. The Property would then be administered as an estate asset where the Trustee would be allowed to sell the Property to satisfy the amount due for the Trustee's attorney's fees and expenses. The Trustee would also have the option of applying any net sale proceeds exceeding the amount due for the Trustee's expenses to the damages due the Estate resulting from the destruction of the wine collection, with any remaining sale credit to be paid to the Prossers. The final Order appealed from authorized the Trustee to execute Quitclaim Deeds on behalf of the Prossers, transfer the Anna's Hope Property to the Chapter 7 Estate, and docket the Deeds with the Recorder of Deeds in the U.S. Virgin Islands. It also permitted the Trustee to sell the Anna's Hope Property to satisfy the amounts due. On September 9, 2013, the Trustee executed the Quitclaim Deeds for the Anna's Hope Property.[1]

In September 2013, while the consolidated appeals were pending, the Prossers requested that the District Court stay the sale of the Anna's Hope Property until the appeals were resolved. They offered the Anna's Hope Property as a supersedeas bond. (Dkt. No. 7).

---

[1] This summary of the background facts is provided to place the current controversy in context. A more complete description of the history of this case is contained in the Court's Memorandum Opinion issued on February 23, 2017. (Dkt. No. 58).

This Court granted the Prossers' Motion to Stay. (Dkt. No. 29). In its Memorandum Opinion, the Court noted that, "in actuality, [the Prossers] are offering their interest in the sale credit as a supersedeas bond" since the Property had already been transferred to the Trustee. (*Id.* at 10 n.6). Although Prosser had valued the Property at $400,000.00 in his 2009 bankruptcy schedules, the Prossers offered a realtor's pricing recommendation valuing the Property at $2,185,000, together with Prosser's explanation, by affidavit, of the reason for the difference in the valuation. The Court accepted the Prossers' submission and deemed the $2.185 million value of the Property as sufficient to satisfy a supersedeas bond. (*Id.* at 9-12).

On November 7, 2017, the Trustee filed the instant Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction. (Dkt. No. 70). In an attached affidavit, the Trustee provided a time-line of recent events that prompted him to file the Motion. He averred, *inter alia*, that, on October 25, 2017, a resident of the Estate Shoys neighborhood where the Anna's Hope Property is located informed him that "someone was removing a large generator out of the building located on Plot 168 of Anna's Hope[.]" (Dkt. No. 70-1 ¶ 3). The Virgin Islands Police Department was contacted. (*Id.* ¶ 5). The Police Department was presented with a Bill of Sale, signed by Jeffrey Prosser and Dawn Prosser, which provided for the sale of two 375 kw generators located at Plot No. 168 Anna's Hope for $50,000.00. (*Id.*; Dkt. No. 70-2). On October 27, 2017, the caretaker allegedly returned to the Property and found the purchaser and a crew preparing to remove the second generator and fuel tanks. (Dkt. No. 70-1 ¶ 10). Removal of the generators from the Anna's Hope Property allegedly involved removing an eight-foot section from the outer wall, cutting off existing locks, and installing new ones. (*Id.* ¶ 9).

In his Memorandum, the Trustee asserts that he has satisfied the four factors required for the issuance of a TRO/Preliminary Injunction: (1) he can show a strong likelihood of success on

the merits, in that the Prossers are again engaging in activity contrary to a Court directive; (2) he will suffer irreparable harm if the Prossers are not enjoined from dissipating the Property; (3) a TRO would not harm the Prossers, as preservation of the Property pending appeal is exactly what they requested in their motion for a stay; and (4) the public interest favors granting injunctive relief, as there is a strong public interest in requiring that parties abide by their bond obligations. (Dkt. No. 70 at 7-9). The Trustee asks the Court to: immediately enjoin the Prossers from selling any portion of the Anna's Hope Property, including any individual parcel or fixture; direct the Prossers to deposit the proceeds from the sale of the generators into an escrow account pending the Court's resolution of the appeals; and set this matter for hearing on the request for a preliminary injunction. (*Id.* at 10).

In their "Response in Opposition to Chapter 7 Trustee's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction; Requests Re. Fees & Expenses," the Prossers state:

> Under the circumstances of this case, i.e., the actual facts, the Trustee has no likelihood of success on the merits, the Trustee is suffering no harm let alone irreparable harm or hardship arising from the sale of the Generators, and the only public interest to be served is that arising from the Court's denial of a motion without any foundation in fact or law.

(Dkt. No. 73 at 7). The focus of their argument is that, because the supersedeas bond is based on real property rather than personal property, and the generators constitute personal property, the Trustee's Motion is meritless. (*Id.* at 6-7). The Prossers attach a Declaration executed by Jeffrey Prosser to their Response in which Prosser states, *inter alia*, that the generators were brought to Plot No. 168 in "the late 1990s" to serve as "removable back-up generators"; it was never his intention that the generators, as personalty, be considered as collateral for the supersedeas bond; he never discussed including any equipment as being part of the property to be sold when he

negotiated the listing agreement with the realtor that constituted the pricing recommendation; the eight-foot wall was "nothing more than a removable concrete block wall," and any removal of the generators requires that the wall be removed to allow sufficient ingress and egress; the wall was disassembled by the purchaser for purposes of removing the generators; and the Prossers did not know who placed the locks on the Property and since their keys did not work on them, they cut them and replaced them. (Dkt. No. 73-1). The Prossers argue that, based on these facts, the generators are personal property and there is no evidence that they even fit within the definition of fixtures. (Dkt. No. 73). Thus, the Trustee's Motion should be denied, and the Prossers should be awarded all fees and expenses in defending this "frivolous" motion designed to harass and damage them. (*Id.*).

In his Reply, the Trustee contends that the generators were included in the Prossers' valuation of the Property and were intended to serve as part of the supersedeas bond, as reflected in the numerous sworn statements Jeffrey Prosser made in his September 2013 affidavit filed in support of his Motion to Stay pending appeal. (Dkt. No. 74). The Trustee also argues that the generators were fixtures, as they were not easily movable; were affixed to individual concrete pads and bolted to the floor; were hard wired to the Property and connected to a 6,000 gallon fuel tank; and were an integral part of the electrical system. (*Id.* at 3-5).

In his Sur-Response, supported by a Declaration, Prosser argues that there is no inconsistency between his September 2013 affidavit and November 12, 2017 declaration because he adequately explained how marketability considerations in 2009 versus 2013 affected the value of the Property. (Dkt. No. 77). He further asserts that the generators were not fixtures, but removable, because they were not permanently encased in concrete flooring. Prosser also notes that the realtor was asked to "list the ground . . . only," and the tax bills for the four plots were

"essentially identical," thus reflecting no additional value for the equipment. (Dkt. Nos. 77, 77-1).

As discussed below, the Court concludes that the Trustee has made the requisite showing for the entry of injunctive relief. The Court will therefore enter a temporary restraining order pending further proceedings.

## II. DISCUSSION

### A. Standard of Review

Under Rule 65 of the Federal Rules of Civil Procedure, the Court may grant injunctive relief with a temporary restraining order or a preliminary injunction. *Am. Tel. & Tel. Co. v. Winback & Conserve Prog. Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994). The same legal standard applies to requests for a temporary restraining order and a preliminary injunction. *Smith v. Litton Loan Servicing, LP*, 2005 WL 289927, at *6 (E.D. Pa. Feb. 4, 2005). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 357 F.3d 297, 301 (3d Cir. 2004) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ("[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties.") (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 197 (3d Cir. 1990) (citation and quotation omitted)). Injunctive relief is "'an extraordinary remedy. . . which should be granted only in limited circumstances.'" *Am. Tel. & Tel. Co.,* 42 F.3d at 1427 (quoting *Frank's GMC Truck Ctr., Inc. v. GM Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)).

To prevail on a motion for a temporary restraining order or preliminary injunctive relief, the moving party must show each of the following four elements: (1) a likelihood of success on

the merits; (2) that he will suffer irreparable harm if the injunction is not granted; (3) that granting preliminary relief will not cause greater harm to the nonmoving party; and (4) that relief is in the public interest. *See Transcontinental Gas Pipe Line Co., LLC v. Permanent Easement for 2.59 Acres*, __ F. App'x __, 2017 WL 4005011, at *2 (3d Cir. Sept. 12, 2017) (citing *Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010)); *Kos Pharms., Inc.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)).

A "district court must consider [the] four elements in determining whether to grant a preliminary injunction[.]" *Goodwin v. Castille*, 465 F. App'x 157, 160 (3d Cir. 2012). "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC,* 428 F.3d 504, 508 (3d Cir. 2005). "Although the Court must balance all four factors to determine whether it should order injunctive relief, as a practical matter, a 'plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate.'" *Wilson v. Spaulding*, 2015 WL 8781510, at *2 (M.D. Pa. Dec. 15, 2015) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).

## B. Analysis

### 1. Likelihood of Success on the Merits

The Trustee contends that he can show a strong likelihood of success on the merits of his Motion, since the Prossers are, once again, "engaging in activity that is directly contrary to a directive of this Court," in that they pledged the Anna's Hope Property as a supersedeas bond; they recently filed a motion to release Plot No. 170, one of the plots underlying the bond, which indicates that they were aware of their obligations under the bond; but they nonetheless sold the two generators in violation of their obligations. (Dkt. No. 70 at 7).

The Prossers respond that, because the generators constitute personal property rather than real property, the Trustee cannot prevail on the merits of his Motion. (Dkt. No. 73 at 7). In other words, the Prossers argue that because the generators constitute personal property which was never contemplated as being encompassed by the supersedeas bond, the Trustee cannot satisfy his burden to establish the requirements for injunctive relief.

The Court concludes that the Trustee has demonstrated a likelihood of success on the merits of his claim that the generators at issue are part of the supersedeas bond. This conclusion is supported by the sworn affidavit of Jeffrey Prosser which accompanied his Motion for a Stay, wherein he offered the Anna's Hope Property as a supersedeas bond in September 2013. At that time, the Trustee opposed the stay and disputed the Prossers' position that the Property was worth $2.185 million because Prosser had valued the Property at $400,000 on his bankruptcy schedules in 2009. The Prossers supported the significantly higher valuation for the Anna's Hope Property pledged as the supersedeas bond by submitting a recommended listing price of the Property from a realtor (Dkt. No. 14-1), together with Prosser's affidavit explaining the difference between the earlier $400,000 and subsequent over $2 million valuation. (Dkt. No. 7-1).[2]

In his affidavit, Prosser explained that across the street from the Anna's Hope Property was the Estate Shoys Property, a main house and guesthouse, which was owned solely by Dawn Prosser, and which certain electrical and mechanical equipment on one of the Anna's Hope lots supported. (Dkt. No. 7-1 ¶ 1). Prosser asserted that at the time he completed his bankruptcy schedules, he assumed that his wife would never sell her tenancy by the entireties interest in the Anna's Hope Property, and therefore he valued *his* tenancy by the entireties interest in that

---

[2] The Anna's Hope Property at issue was comprised of four lots—Plot Numbers 168, 169, 170 and 171.

Property knowing that Dawn Prosser would not sell her interest, and that he could not sell without her consent. (*Id.*). Prosser further noted that at the time he completed the bankruptcy schedules, he understood that the four lots on the Anna's Hope Property were to be evaluated independently, and he therefore viewed the generator/utility equipment as a "hindrance" that would have to be torn down if someone bought that lot alone. (*Id.*).

Prosser then went on to explain the different considerations that went into the 2013 evaluation that resulted in the higher valuation. He stated that, when viewing the four Anna's Hope lots together, "the generator/utility equipment becomes an enhancement, a multi-million dollar improvement rather than a hindrance or impediment to the value of the single lot on which they sit." (*Id.*). He reiterated that when he valued the lots in 2009, he did not separately value the equipment room and the equipment it housed (comprised of the generators, an air conditioning system, reverse osmosis system, phone and cable TV systems), but in 2013—when he sought the stay—he did take that equipment room and its contents into consideration, which provided "significant added value" to the Property. (*Id.* ¶ 2). Prosser continued: "[I]t is now apparent that the millions of dollars in infrastructure improvements on the Anna's Hope equipment room property can be used to service the Estate Shoys residences as well as a new residence on the Anna's Hope properties. The equipment room represents added-value to the Anna's Hope property. . . . Also, to the extent that there is an owner of either of the Estate Shoys residences other than [Prosser or his wife], the equipment room presents a significant potential profit center for provision of power and other utility services to those residences." (*Id.* ¶ 3).

These sworn statements, made with the goal of the Court accepting the Anna's Hope Property as a supersedeas bond to support a stay pending appeal, are not as easily avoided or explained away as Prosser suggests in his Sur-Response. Several examples illustrate this point.

First, Prosser claims that in rendering its Opinion approving the supersedeas bond, "the Court was not relying upon the opinion of Mr. Prosser—the Court relied upon the opinion of the third party realtor." (Dkt. No. 77 at 2). In reality, however, the Court's Memorandum Opinion reads: "[T]he Court need not rely *solely* on Mr. Prosser's affidavits for its approval of the Anna's Hope Property as a supersedeas bond, because the affidavits are supported by a realtor's recommended listing price of $2,185,000 as evidence of the value of the Anna's Hope Property." (Dkt. No. 29 at 11) (emphasis added). The difference between what Prosser asserts and what the Court's Opinion states is obvious.

Second, while Prosser now argues that the generators and other equipment were "specifically tied to providing services to the properties across the street" (Dkt. No. 77 at 3), that does not erase his statement made in 2013 that the "infrastructure improvements on the Anna's Hope equipment room property can be used to service the Estate Shoys residences *as well as a new residence on the Anna's Hope properties*. The equipment room represents *added-value to the Anna's Hope property*." (Dkt. No. 7-1) (emphasis added).

Third, while Prosser states—consistent with his earlier affidavit—that the generators were not "specifically devoted to the Anna's Hope Property" (Dkt. No. 77 at 4), that does not negate his earlier statement that the generators could serve *both* the Estate Shoys and Anna's Hope Property. (Dkt. No. 7-1 ¶ 3). Nor does it negate his statement in support of the higher valuation in his Motion for a Stay that "the Anna's Hope lots are now valued independent of the Estate Shoys property[.]" (Dkt. No. 7 at 12).

Finally, Prosser asserts that "[a] plain reading of the 2013 Declaration makes it clear that his references to the equipment, including the subject Generators enhanced the combined value of the Anna's Hope[] Property well beyond the $2 million land-alone valuation." (Dkt. No. 77 at 2).

If Prosser is thereby suggesting that the value of the equipment could not possibly have been intended to support the $2 million value of the Property offered in the supersedeas bond, such an assertion appears irreconcilable with the very first sworn statement contained in Prosser's affidavit. That statement reads: "This Affidavit is given in support of the value sworn to by me of the four (4) plots in Anna's Hope 168, 169, 170 and 171 (referred to in these proceedings as the 'Anna's Hope property') of *$2,000,000*." (Dkt. No. 7-1 at 2) (emphasis added). There would have been no need to mention the generators and the other equipment in the equipment room if their only purpose was that they enhanced the value of the Property "well beyond" $2 million, because the affidavit, by its express terms, was supporting the $2 million valuation, and it was the difference between Prosser's earlier $400,000 valuation and the higher $2 million valuation that was purportedly being explained in Prosser's affidavit.

In sum, in light of the sworn statements from Prosser in his 2013 affidavit, the Court is unconvinced of his current claim that the generators were not to be considered as part of the collateral when he sought to persuade this Court to accept the Anna's Hope Property as a supersedeas bond. On this ground alone, the Trustee has shown a likelihood of success on the merits.

Prosser also argues, in response to the Trustee's contentions, that the generators are not permanent fixtures that have been annexed to the realty. (Dkt. No. 77 at 4). In *James v. Antilles Gas Corp.*, 2000 WL 1349233, 43 V.I. 37 (Terr. Ct. V.I. July 19, 2000), the then-Territorial Court of the Virgin Islands cited a treatise on real property that provided a test for distinguishing between real property fixtures and personal property:

> An excellent candidate for a certain rule is the half-inch formula. Under this formula, anything which could be moved more than a half inch by one blow with a hammer weighing not more than five pounds and swung by a man weighing not more than 250 pounds would not be a fixture. Another formula might be the screw-

> driver-[crescent]-wrench-one-hour rule. Under such a rule anything affixed to the realty would be regarded as a fixture unless one man with a screwdriver and a crescent wrench could loosen it from the floor or wall within one hour.

*Id.* at n.12 (quoting 8 Richard R. Powell, *Powell on Real Property*, ¶ 652[2] (1998) (quoting White & Summers, Uniform Commercial Code § 25.8 at 1056 n.66 (2d ed. 1980))); *see also DeJesus v. V.I. Water & Power Auth.,* 2011 WL 5864552, at *4 n.6 (V.I. Super. Ct. Oct. 26, 2011) (opining that "'[f]ixtures' are articles of personal property that have been 'so annexed to the realty that [they are] regarded as part and parcel of the land.'") (quoting *Com. v. Foster*, 2011 WL 3850026, at *4 (Pa. Super. Ct. 2011) (citing Black's Law Dictionary 574 (6th ed. 1991))); 11A V.I.C. Art. 9 § 9-102(a)(41) (defining fixtures as "goods that have become so related to particular real property that an interest in them arises under real property law"); 2 Tiffany Real Prop. § 606 (3d ed.) ("A fixture is something which is affixed or attached as a permanent appendage or structural part of the land. A fixture is by definition an improvement to real property. It is a thing which, though originally a movable chattel, is, by reason of its annexation to land, regarded as a part of the land, partaking of its character and belonging, in the ordinary case at least, to the person or persons owning the land.").

Under any of these definitions, the generators appear likely to constitute fixtures, particularly given Prosser's statements that if Plot No. 168 alone was sold, the owner would have to "tear down" the generator/utility equipment as it covered "a good portion of the street front and would be a hindrance to anyone building on that lot" (Dkt. No. 7-1 at 3), and that the eight-foot outer wall had to be "disassembled by the purchaser for purposes of removing the Generators." (Dkt. No. 73-1).

The court in *James* set forth a three-pronged test to apply when determining if a structure at issue is real or personal property: "(1) the extent of actual physical annexation to the realty; (2)

application or adaptation of the structure to the use or purpose to which the realty is devoted; and (3) intention of the person making annexation to make a permanent accession to the land." *James,* 2000 WL 1349233, at *3 (citations omitted). In his Reply, the Trustee maintains that each of the *James* prongs is met in this case, while Prosser in his Sur-Response argues to the contrary. However, Prosser's Sur-Response does not and cannot explain away the statements he made in September 2013, and does not refute the contention that the *James* factors are met here.

In relation to the first *James* factor, Prosser attempts, in his brief, to minimize the physical annexation of the generators to the Property by claiming that, even though they were bolted in place, they were not "permanently encased in concrete flooring," and that fact, in addition to the fact that wiring could be easily disconnected, was evidence of their removabililty. (Dkt. No. 77 at 4). However, in 2013, he described removal of the generator utility equipment in terms of requiring a "tear[ing] down as it cover[ed] a good portion of the street front and would be a hindrance to anyone building a home on that lot." (Dkt. No. 7-1 at 3). Moreover, the actual removal of the equipment in 2017 allegedly required a crew of workers who had to unbolt the generators from the pads and disassemble an eight-foot wall in order to accomplish their task. The description of the housing for the generators and the effort necessary to remove them does not suggest easily removable personal property, but large equipment that is so connected to the real property that it has become part of it—*i.e.*, a fixture. In addition, Prosser provides no authority for his rule of thumb that in order for the generator to be a fixture, it would have had to have been "permanently encased in concrete flooring."

Further, while Prosser—in an argument that relates to the second and third *James* factors— now claims that the generators and other equipment were tied to providing services to the properties across the street, that does not erase his sworn statement made in 2013, as discussed

above, that the "infrastructure improvements on the Anna's Hope equipment room property can be used to service the Estate Shoys residences *as well as a new residence on the Anna's Hope properties.* The equipment room represents added-value to the Anna's Hope property." (Dkt. No. 7-1 at 5) (emphasis added).

The Court finds that the Trustee has shown a likelihood of success on the merits of his claim that the generators were fixtures annexed to the Anna's Hope real property, and were valued as such for purposes of the supersedeas bond. On that ground as well, the Trustee has shown that the likelihood of success factor weighs in favor of granting a TRO.

### 2. Irreparable Harm

The Trustee argues that he will suffer irreparable harm if the Prossers are not prohibited from further selling pieces of the Property that they put up as a supersedeas bond to secure the Trustee pending appeal. (Dkt. No. 70 at 8). The Trustee quotes the Prossers' brief in support of a stay wherein they admitted that they were "without sufficient monetary assets to post a cash supersedeas bond;" that they did not have "cash sufficient to pay the judgment without question;" and that there were no other assets to pledge. (Dkt. No. 70 at 7-8, quoting Dkt. No. 7 at 20, 24). Given the Bankruptcy Court Orders providing, at that time, that the Prossers owed approximately $950,000.00 to the Trustee (based on the damages to the Bankruptcy Estate from the dissipation of the wine and the Trustee's administrative expenses, awarded in two separate Orders), the Trustee asserts that there would be no way to enforce those Orders, should the Trustee prevail on appeal, if the Prossers continue to dissipate the Anna's Hope Property and its fixtures (*Id.*).

The Prossers counter that the Trustee would suffer no harm, let alone irreparable harm, from the sale of the generators because they constitute personal property that was not encompassed by the supersedeas bond. (Dkt. No. 73 at 7). The Court has rejected this argument above in the

context of a likelihood of success on the merits, and it fares no better on the irreparable harm prong of the TRO analysis.

To satisfy the irreparable harm element, the party moving for injunctive relief must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 217 n.11 (3d Cir. 2014) (emphasis in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Failure to demonstrate irreparable injury "must necessarily result in the denial of a preliminary injunction." *ACE Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727, 732 (3d Cir. 2009) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989); *NutraSweet Co.*, 176 F.3d at 153 ("In the absence of irreparable injury, no preliminary injunction would lie, even if the other three elements . . . were found.").

It is well-established that an injunction may issue "to prevent the dissipation of assets that would satisfy a judgment." *Jacobson v. Kim (In re Lev)*, 2009 WL 1025410, at *4 (Bankr. D.N.J. Mar. 31, 2009). In *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186 (3d Cir. 1990), the Third Circuit held that a district court could issue a preliminary injunction to protect a damages remedy, finding that *Deckert v. Indep. Shares Corp,* 311 U.S. 282 (1940) governed such a circumstance. *Id.* at 196-97. The Court in *Hoxworth* pointed out that the Supreme Court held in *Deckert* that an injunction was a "'reasonable measure to preserve the status quo'" to "ensure the satisfiability of a potential future judgment ordering the transfer of money" from an alleged insolvent defendant to plaintiffs. *Id.* at 196 (quoting *Deckert*, 311 U.S. at 290); *see id.* at 205 ("Appellants contend . . . that the possibility of an unsatisfied money judgment cannot, as a matter of law, constitute irreparable injury for purposes of granting a preliminary injunction. We find ample authority to the contrary, however.") (citing cases); *see also Saturn of Denville, NJ, LP v. Gen'l Motors Corp.*,

2009 WL 1545559, at *7 (D.N.J. May 29, 2009) ("Courts have found irreparable harm where the ability of a defendant to pay a potential money damages award is unlikely, as is the case here.") (citing, *inter alia*, 11A Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure 2948.1 (2009) and *Hoxworth*, 903 F.2d at 196); *Leaf Funding, Inc. v. Butera*, 2006 WL 2868976, at *3 (M.D. Tenn. Oct. 5, 2006) ("[T]he possibility of dissipating assets so that funds or property no longer exist in order to compensate the Plaintiff can establish irreparable harm.") (citing, *inter alia, In re Focus Media, Inc*., 387 F.3d 1077, 1086 (9th Cir. 2004)); *see, e.g., Elliott v. Kiesewetter*, 98 F.3d 47, 58 (3d Cir. 1996) ("That irreparable harm would occur absent an asset freeze is even more apparent where the very assets subject to a potential judgment will likely be dissipated without entry of the order. Thus, consistent with *Hoxworth,* we hold that a court may find that a party seeking an asset freeze to preserve a money judgment may show irreparable injury by showing that the freeze is necessary to prevent the consumption, dissipation or fraudulent conveyance of the assets that the party pursuing the asset freeze seeks to recover in the underlying litigation. The fact that the assets subject to the Freeze Order are primarily money assets does not preclude entry of a freeze order enjoining the use of those assets."); *PNY Techs.., Inc. v. Salhi*, 2016 WL 4267940, at *2 (D.N.J. Aug. 10, 2016) (in assessing whether to grant preliminary injunction, district court observed, "Obviously, if it is true that [defendant] is attempting to make himself judgment proof by dissipating and transferring his assets domestically and overseas, then [plaintiff] will be irreparably harmed.") (citing *Hoxworth*, 903 F.2d at 196).

Here, the Trustee has made a showing of irreparable harm. In their Motion for a Stay, the Prossers admitted that they did not have any assets, other than the Anna's Hope Property, that they could offer as a supersedeas bond for a stay pending appeal. They asserted that "[r]eview of the docket in Mr. Prosser's bankruptcy case … clearly demonstrates that the Prossers are without

sufficient monetary assets to post a cash supersedeas bond" (Dkt. No. 7 at 20), and "[m]ost important, however, is that unless the Court accepts the Anna's Hope Property … the Prossers will not be able to post sufficient collateral to stay the appeal …." (*Id.* at 24). Thus, by the Prossers' own admission, the Trustee would be able to satisfy the judgment against the Prossers only from the sale of the Property.

In view of the foregoing, the Trustee has made the requisite showing for purposes of a TRO that he would be irreparably harmed by dissipation of the only available assets that could compensate the Trustee. *See Leaf Funding, Inc.*, 2006 WL 2868976, at *3. Accordingly, the Court finds that the irreparable harm factor favors the granting of a TRO.

### 3. Harm to Non-Moving Party

The Trustee claims that the balance of harms weighs in his favor and against the Debtor, because the Prossers' Motion to Stay was predicated on the preservation of the Anna's Hope Property pending adjudication of the appeals. (Dkt. No. 70 at 9). The Trustee thus concludes that the Prossers cannot claim any hardship in their inability to sell the Anna's Hope Property or its fixtures during the pendency of the appeals. (*Id.* at 8-9).

Based on their contention that the generators are not part of the Anna's Hope Property and thus not encompassed within the supersedeas bond, the Prossers respond that the Trustee will not be harmed by denial of a motion that is "without foundation in fact or law." (Dkt. No. 73 at 7).

The Court finds that the Trustee has made the requisite showing on the balance of harms factor for the entry of a TRO. As the court concluded in *In re Lev,* 2009 WL 1025410, at *4: "The harm that the Trustee would suffer upon a transfer of the Property [the source of funds to satisfy the existing judgments against the debtors] is greater than that suffered by [the debtors] if the status quo is maintained since the Trustee would face an inability to recover on the judgments." Similarly

here, the Trustee's inability to recover on a judgment if he prevails, in the absence of the preservation of the Anna's Hope Property, would render his harm greater than that of the Prossers who agreed from the outset to the preservation of the Property by posting it as a supersedeas bond. Further, the Court's finding above that the Trustee has made the requisite showing that the generators fall within the scope of the supersedeas bond renders the Prossers' argument that the Trustee's Motion lacks a foundation in law and fact meritless. In sum, the Court finds that the harm to the non-moving party factor weighs in favor of granting injunctive relief.

### 4. Public Interest

Finally, the Trustee asserts that the public interest favors issuing injunctive relief because, if the Court fails to issue an injunction, the supersedeas bond will be without any force or purpose. Moreover, a strong public interest exists in requiring that parties abide by their bond obligations and in ensuring that a Court's judgment has a valid mechanism by which it may be enforced pending appeal. (Dkt. No. 70 at 9).

The Prossers reply, in a footnote, that the public interest is served because the generators were sold in order to provide power "to two major grocery stores on St. Croix," where electrical power for lights and refrigeration had been lost as a consequence of Hurricane Maria. (Dkt. No. 73 at 7 n.5).

The Court finds that this factor also weighs in favor of granting a TRO. The Court agrees that the public has an interest in protecting and preserving the integrity of supersedeas bonds, which, in a bankruptcy setting "'indemnif[ies] the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court.'" *In re Tribune Media Co*., 799 F.3d 272, 281 (3d Cir. 2015) (quoting *In re Theatre Holding Corp., 22 B.R. 884, 885 (Bankr. S.D.N.Y. 1982)). Issuance of a TRO under the circumstances here will

enforce rights under a bond and preserve the status quo until the appeals are resolved, both of which will serve the public interest.

The fact that the generators were allegedly sold to a person who owns two grocery stores on St. Croix to provide lights and refrigeration certainly serves the public interest by presumably allowing those stores to operate and address the needs of residents in the aftermath of Hurricane Maria. However, the fact that the generators may have been put to good use does not overcome the more general public interest in ensuring that anyone who provides a supersedeas bond on appeal must abide by its terms. Indeed, the good use to which the generators were allegedly put does not give the Prossers license to either continue to dissipate assets or to keep the proceeds from the sale of the generators. Accordingly, the public interest factor also supports the issuance of a TRO, and an Order enjoining the further dissipation of assets and requiring the proceeds from the sale of the generators to be placed in an escrow account is therefore appropriate.

## 5. Scope of the Temporary Restraining Order

In view of the foregoing, the Court finds that the four factors to be considered in ruling on a request for a TRO all weigh in favor of the Trustee. As a result, the Court will grant the Trustee's Motion for a Temporary Restraining Order.

The status quo would be maintained by enjoining the Prossers from selling any other fixtures or assets associated with the Property that they offered as a supersedeas bond, and from enjoining them or anyone associated with them through contract or otherwise (affiliated third parties) from impairing, damaging, or removing any part of the Anna's Hope Property or any individual fixture thereon. The status quo would also be maintained by requiring the Prossers to place the funds from the sale of the generators in an interest-bearing escrow account pending further Order of the Court.

Accordingly, in entering this TRO, the Court will prohibit the Prossers from selling any portion of the Anna's Hope Property, including any fixture thereon, and will prohibit the Prossers and their affiliated third parties from impairing, damaging, or removing any part of the Anna's Hope Property or any individual fixture thereon. Also to preserve the status quo, the Court will require the Prossers to place the entire proceeds they received from the sale of the generators in an interest-bearing escrow account pending further Order of the Court. In this regard, the Court will require the Prossers—within two days of the issuance of this Order—to provide the Court with sworn verification: (1) of the amount of proceeds they received for the generators; and (2) that they have opened the aforementioned account and deposited the funds therein.

The Court will set a briefing schedule and will set this matter for a hearing on the Trustee's Motion for a Preliminary Injunction.

## C. Security

Pursuant to Fed. R. Civ. P. 65(c), a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Neither party addressed this point in their briefs.

In *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412 (3d Cir. 2010), the Third Circuit explained the Rule 65(c) security requirement:

> As we held in *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 103 (3d Cir. 1988), "[a]lthough the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Id.* Such an extremely narrow exception exists "when complying with the preliminary injunction 'raises no risk of monetary loss to the defendant.'" *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 210 (3d Cir. 1990) (quoting *Sys. Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1145 (3d Cir. 1977)).

* * *

> We have never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities. Rather, we have recognized exceptions in other contexts only where "the balance of [the] equities weighs overwhelmingly in favor of the party seeking the injunction" and when the District Court "make[s] specific findings. *Elliott v. Kisewetter,* 98 F.3d 47, 60 (3d Cir. 1996); *see also Temple Univ. v. White,* 941 F.2d 201, 219 n.26 (3d Cir. 1991) (collecting cases).

*Id.* at 426. In *Temple Univ.*, the Third Circuit determined that, "at least in noncommercial cases, the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." 941 F.2d at 219 (internal quotation marks omitted).

The Court finds that this is one of those rare circumstances where the balance of equities weighs in favor of waiving the Trustee's bond requirement. In the Court's view, imposing such a requirement would turn Rule 65(c) on its head by compelling the Trustee to post a bond in a situation where he has demonstrated a likelihood of success on his claim that he was required to file an emergency motion for a TRO because the alleged offenders did not comply with their own pledge to honor a supersedeas bond, filed as security for a stay pending appeal. There would be no risk of loss to the Prossers in entering the TRO because they could not lose funds that they were not entitled to *ab initio*. Accordingly, the Court will not require the Trustee to post a Rule 65(c) bond.

## III.    CONCLUSION

In view of the foregoing the Court will grant the Trustee's Motion for Temporary Restraining Order. An appropriate Order accompanies this Memorandum Opinion.

Date: November 20, 2017

_____/s/_____
WILMA A. LEWIS
Chief Judge